Filed 9/29/14 In re D.F. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re D.F. et al., Persons Coming Under the Juvenile Court Law. | B253190 |
| | (L.A.S.C. No. DK00033) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ERICA P. et al. Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge. Affirmed and remanded.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Erica P.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant D. F.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

Appellants, Erica P. (Mother) and D. F. (Father), appeal from orders of the juvenile court that declared their three children dependents of the court under Welfare and Institutions Code section 300,[1] subdivisions (a) and (b) based on allegations that Father physically abused Mother; that Mother failed to protect the children from exposure to the domestic abuse; and that Father's mental health issues placed the children at risk of harm. Before this court, the parents challenge the juvenile court's jurisdictional findings and disposition orders. Mother assails the court's jurisdiction findings under section 300, subdivision (b) pointing out that as of the jurisdiction hearing the abuse had ended, and argues that given her compliance with the case plan the children were not at a current risk of harm based on her failure to protect them. Mother also asserts that the evidence presented did not support the court's disposition order to remove the children from her custody. Father separately argues that the court erred in exercising jurisdiction under section 300, subdivision (a) because there were no allegations or evidence that he abused the children and his alleged abuse of Mother did not place the children at risk of harm. Thus, Father asks this court to strike the section 300, subdivision (a) finding from the petition. Father also asserts that the court erred in finding that the Indian Child Welfare Act (ICWA) did not apply to the case. He maintains that the information revealed in the investigation required the Department of Children and Family Services (the Department) to send an ICWA notice of the proceedings to the Bureau of Indian Affairs and the tribes he had identified. As we shall explain, we affirm the court's exercise of jurisdiction and the disposition orders, and remand for further proceedings with respect to ICWA.

### FACTUAL AND PROCEDURAL BACKGROUND

### The Department's Pre-Petition Contact with the Family.

In June 2013, the Department received a report that Father committed physical and verbal abuse towards Mother and that the children De. F. (then seven years old), Da. F.

---

[1] All further code references, unless indicated otherwise, are to the Welfare and Institutions Code.

(then six years old) and 15-month-old Dominique F. witnessed the domestic violence. The Department investigated, discovering that Father had accused Mother of infidelity and grabbed her arm causing a bruise, and that the children observed the incident. Father also allegedly screamed and yelled profanities at Mother, threatened to beat Mother and to take the children away from her. As a result, Mother fled with the children to a domestic violence shelter and obtained a temporary restraining order.[2]

It was further reported that similar incidents of Father's verbal abuse towards Mother in front of the children had been occurring since 2011.

The Department social worker met with Mother, who confirmed she had left the home due to Father's abuse. Nonetheless, Mother was not forthcoming with information about what the children had witnessed and minimized the risk to them. Mother did, however, describe that Father had a history of mental health issues. She reported that in 2012, Father was hospitalized after exhibiting delusional and paranoid behaviors, including placing black trash bags on the windows of the home, and disabling the smoke detectors. Father apparently believed the smoke detectors were surveillance devices and that his family was being watched. He also prevented the family from leaving the home out of concern they were being followed. In May 2013, these behaviors re-emerged.

According to De. F., and Da. F., Father often yelled at Mother and called her "bad names." They observed Father strike Mother. They also confirmed Father's strange behavior in the home and both children told the social worker that Father had struck them with a belt to discipline them.

The social worker also interviewed Father, who confirmed Mother and the children left the home in May 2013. Although he admitted that he grabbed Mother's arm during an argument, he denied that he hit Mother, and minimized the confrontations between them. He said that Mother was arguing with him in front of the children and that she refused to discuss the matter outside so he grabbed her arm to escort her outside. He

---

[2]     Mother indicated that she obtained the restraining order against Father because the domestic violence shelter required her to do so as a condition to her entering the shelter.

3

said that his arguments with Mother never escalated to a physical altercation. He reported that once the police responded to the home because of an argument, but that no one was arrested. With respect to his mental health concerns, Father stated that in 2012 he was evaluated and placed on a hospital hold for three or four days, then released. He claimed that he was not diagnosed or given any medication, nor was he instructed to return for treatment. He further denied having any current mental health issues.

On July 10, 2013, the Mother and children left the domestic violence shelter and returned to live with Father. Despite Mother's report of the abuse, the fact she had obtained a restraining order against Father, and that she had agreed to a safety plan that included finding alternative housing, Mother told the social worker that she could not find a place to live with the children so she decided to reconcile with Father.

**Dependency Proceedings.**

On July 19, 2013, the Department filed a section 300 petition on behalf of the children. The petition alleged that the children were individuals described under section 300, subdivisions (a) and (b) based on Father's domestic abuse of Mother, Father's mental instability and Mother's failure to protect the children.[3] The court ordered the children detained in protective custody.

---

[3] As sustained, the amended petition alleged under section 300, subdivisions (a) and (b):

"[Under subdivisions (a) and (b-1)] In May 2013, . . . father . . . engaged in a violent altercation with . . . mother . . . in which . . . father grabbed the mother by the arm inflicting a bruise to the mother's arm. On a prior occasion, the father struck the mother's abdomen with the father's hand in the presence of the child [Da. F.]. On a prior occasion, the father struck the mother in the presence of the child [De. F.]. The mother failed to protect the children in that the mother knew of the father's violence and allowed the children's father to remain in the children's home. Such violent conduct by the children's father against the mother and the mother's failure to protect the children endangers the children's physical health and safety and place the children at risk of physical harm, damage, and failure to protect."

"[Under subdivision (b-2)] In May 2013, . . . father . . . demonstrated bizarre behavior including paranoia, which renders the father incapable of providing regular care

4

When the Department social worker attempted to interview the children again, they refused to speak with the investigator. In addition, Mother denied the allegations of domestic abuse alleged in the petition. According to Mother, Father never "raised his hand" to her.

She also said that in 2010 Father behaved strangely so the maternal grandfather called the police, and as a result Father was hospitalized. She did not recall if Father was diagnosed, but stated that he was not given any medication, and was discharged from the hospital. She stated he had not exhibited any strange behaviors since 2010. Mother said even when Father displayed strange behavior he was not abusive but rather protective towards the family. She said Father acted jealous towards her; Mother did not find his current behavior bizarre, but instead she thought he was merely insecure. Nonetheless, a week later, Mother told the social worker that after further reflection, she agreed Father may have current mental health issues. She also denied having recent contact with him and was looking for a new apartment. She no longer wanted to reconcile with him. Mother admitted that she and Father yelled at each other in front of the children.

Father did not show up for his interview with the Department social worker and missed three visits with the children. He did not make himself available for a further interview.

By the mid-September 2013 jurisdiction/disposition hearing, Mother completed a program of domestic violence education and a parenting education program. Mother cooperated with the Department. Although she was unemployed, she was working on her undergraduate degree. She also visited the children regularly and acted appropriately during the visits. Mother admitted that she had not yet found suitable housing.

and supervision of the children. In 2012, the children's father was hospitalized for evaluation and treatment of the father's mental and emotional problems. . . . [M]other . . . failed to protect the children when the mother knew of father's mental health history and allowed the father to reside in the children's home and have unlimited access to the children. The father's mental and emotional problems and the mother's failure to protect the children endangers the children's physical health and safety and places the children at risk of physical harm, damage, and failure to protect."

The Department submitted a report from the multidisciplinary Assessment Team ("MAT"). Father refused to participate and cursed at the MAT assessor several times. The assessor noted concerns that Father had "unmet mental health needs" and Mother was "unable to recognize that Father's mental health issues impede his ability to provide the children with a safe and secure home environment."

During the MAT assessment it was also reported that Mother was residing at her parents' home, which was not suitable for the children. According to the MAT assessor, the children appeared bonded to Mother and were affectionate with her.

Mother was receiving counseling and was fully compliant with the case plan and motivated to reunify with the children. The domestic violence case manager wrote a letter in support of Mother in which the manager expressed that she did not understand why the children had not been released to Mother. However, in an interview with the social worker the day before Mother completed the program, Mother denied Father ever abused her, denied there was any domestic violence between them, and denied having any problems in that regard despite moving out of the home, relocating herself and the children to a domestic violence shelter, and requesting a restraining order against Father.

The court continued the matter for the Department to conduct an investigation under the ICWA, and to send notices if necessary. At the time of the original detention hearing, the completed ICWA-020 form indicated Father may have Native American ancestry in Cherokee, Blackfoot, or Blackfeet tribes. At the detention hearing, Father stated that though he was not affiliated with a tribe, his grandparents had Cherokee and either Blackfoot or Blackfeet ancestry.

On November 6, 2013, the court tried the matter. The court received in evidence the Department reports, documents from the parents indicating Mother's completion of domestic violence and parenting programs, her positive participation in services during her 30-day stay at the domestic violence shelter, as well as positive reports, diplomas, letters, and articles regarding Father's participation in higher education. The court received stipulated testimony from Father. The parties stipulated that if called to testify, Father would state the incidents involving his hospitalization for mental health issues

6

occurred in 2010, not 2012. He also said that he was hospitalized in 2012 after being assaulted, but not for mental health reasons.

Mother testified during the hearing that Father grabbed her arm and asked to talk to her outside. She denied that he left a bruise on her arm. She testified that although she and Father argued, their arguments never escalated into physical violence. She left the home and obtained a restraining order against Father because it was required by the shelter. She denied Father ever abused her.

Mother further testified that when she left the shelter, she went to a friend's home, and was unable to reach the social worker. Mother contacted Father to tell him she and the children needed a place to stay and asked him if she could stay at his sister's home. Mother denied moving back in with Father when she left the shelter. She claimed she never resided with Father again after the restraining order was issued. With respect to Father's mental health, she claimed she was not aware of Father having a condition; she stated he acted bizarrely for a time but after the doctors took him off Vicodin, Father no longer acted strangely.

The court sustained an amended petition under section 300, subdivisions (a) and (b). The court did not find Mother credible based on her changing her prior statements in which she expressed fear of Father and her efforts to flee to a domestic violence shelter with the children.

With respect to the disposition, the court received stipulated testimony from Mother that she completed her domestic violence and parenting programs, the restraining order against Father was still in effect, and she currently resided with the maternal grandmother. Mother disputed the information that the grandparents' home was unsuitable and requested that they be released to her custody or, alternatively, that she be permitted unmonitored contact with them. The children's attorney joined the Department's recommendation and asked for an order that the Department reassess the parenting and domestic violence program Mother attended out of concern that the day before Mother completed the program, she still denied there was any violence in the home.

7

The court declared the children dependents, removed them from parental custody, and ordered the Department to provide family reunification services including monitored visitation. In reference to the letter of support from the domestic violence case manager, the court explained: "The letter on Project Peacemaker's letterhead, the case manager is very adamant that it is a travesty of injustice to keep the mother away from the children and is beyond the scope of decency, but I don't know what they are hearing in their program from her, but everything we are hearing here is that she's in full denial of any risk posed to the children." The court "stayed" the orders for a further ICWA investigation.

On December 11, 2013, the court conducted the continued hearing. The Department submitted a report informing the court that the social worker had interviewed Father. Father denied having an Indian registration card, did not know anyone in his family who had an Indian registration card, was not aware of any relatives having "documented" Indian ancestry. He also denied that Mother had any Indian ancestry.

The court asked whether any party believed the ICWA investigation was insufficient or had any objection to the court finding the investigation complete. Father did not object. The court lifted the stay, entered the disposition orders, and found the ICWA did not apply.

The parents timely filed their appeals.

### DISCUSSION

On appeal the parents claim that several of the juvenile dependency court's findings and orders must be reversed. However, before we discuss the merits of the parent's respective contentions, we address a preliminary matter relating to the exercise of dependency jurisdiction.

In this court the parents *do not* assail the court's exercise of jurisdiction under section 300, subdivision (b-2) based on the findings that Father's mental instability rendered Father incapable of providing care and supervision of the children and that Mother failed to protect the children despite Mother's awareness of Father's mental health history. In addition, neither parent has challenged the court's exercise of

8

jurisdiction under subdivision (b-1) based on the finding that Father physically abused the Mother in the children's presence. Where, as here, a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) As a result, "an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.)

This notwithstanding, we will reach the merits of the Mother's contentions with respect to the sustained jurisdictional findings that relate to her under section 300, subdivision (b-1), namely that she failed to protect the children from exposure to domestic violence, because those findings could affect her rights in the future in other contexts, or if dependency proceedings were ever initiated again with regard to the children. (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432 [holding that appeals in dependency matters are not moot if the error asserted may affect the outcome of a subsequent proceeding].)[4]

### A. Jurisdictional Findings

We review the jurisdictional findings for "any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*In re David M.* (2005) 134 Cal.App.4th 822, 828 [jurisdictional findings]; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762 [dispositional orders].) "Under the substantial evidence rule, we have no power to pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or determine where the weight of the evidence lies." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748-749, fn. 6.) Where there is more than one

---

[4]    We do reach the merits of Father's contentions with respect to the section 300, subdivision (a) findings because he has not demonstrated how he has suffered any prejudice—how those findings could affect his rights in other proceedings.

9

inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its decisions for those of the trier of fact.  Under this standard, we review the evidentiary record in the light most favorable to the order.  (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1135.)

Mother attacks the juvenile court's jurisdiction findings under section 300, subdivision (b-1) as they pertain to her conduct—the failure to protect the children from exposure to Father's acts of domestic abuse directed at Mother.[5]  Mother stated that by the time of the jurisdiction hearing in September 2013 she had completed programs in domestic violence and parent education, and an emergency domestic violence shelter program.  She pointed to letters from her treaters and claimed that she had gained insight into the issues that led to the Department's intervention as well as improved her parenting skills.  She further maintained that she would no longer have contact with Father, was looking for an apartment and had complied with the case plan.  Consequently, Mother argues there was no evidence by the time of the hearing to indicate that her conduct would cause a substantial harm to the children.

To warrant jurisdiction under that subdivision, there must be evidence of "three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness."  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

---

[5]     That provision reads in pertinent part as follows: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . ." (§ 300, subd. (b).)

We conclude there was sufficient evidence to support the finding alleged in (b-1). Even though by the time of the jurisdictional hearing, Mother no longer lived with Father and had completed domestic violence classes and parenting programs, these matters must be viewed in the full context of the case. "[T]he question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M., supra,* 1 Cal.App.4th at p. 824; italics in original.) A showing of prior harm is sufficient to support the initial exercise of jurisdiction under section 300, subdivision (b). (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1434-1439.) Nonetheless, the court may consider past events when determining whether a child presently needs the juvenile court's protection. (*In re Diamond H., supra,* 82 Cal.App.4th at p. 1135; *In re Troy D.* (1989) 215 Cal.App.3d 889, 899-900.) A parent's past conduct is a good predictor of future behavior. (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169-1170.) "Facts supporting allegations that a child is one described by section 300 are cumulative." (*In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1050.) Thus, the court "must consider all the circumstances affecting the child, wherever they occur." (*Id.* at pp. 1048, 1049.)

Notwithstanding Mother's completion of programs and classes and the letters of support attesting to Mother's progress, as the juvenile court recognized, the day before she completed the domestic violence program, Mother denied the physical abuse. Initially, however, in June 2013, Mother described to th**e** Department social worker the instances of physical abuse and verbal abuse by Father and both Da. F. and De. F. confirmed the abuse. However, once the Department filed the dependency petition, the Mother changed her story—she denied that Father had ever abused her and minimized his conduct and behavior. Her denials persisted throughout the proceedings, including during her testimony at the jurisdictional hearing. Mother's steadfast refusal to acknowledge the abuse by Father undermines her claims of insight and her credibility.

Moreover, although in May 2013 Mother fled with the children and obtained the restraining order against Father, she did so only because the domestic violence shelter required her to obtain the order as a condition to her entering the shelter. Indeed, she reconciled with the Father in June of 2013, and without court intervention, it does not

11

appear Mother would have left him.  (See *In re Carlos T.* (2009)174 Cal.App.4th 795, 800, 806 [affirming the exercise of jurisdiction based on substantial risk where although father was incarcerated he denied responsibility for having previously abused both children, the mother denied responsibility for allowing the abuse to occur, and "there [was] every reason to believe that [the] father would resume his sexual abuse of [the minors] without the state intervening to prevent him from obtaining access to them"].)

Mother's lack of insight goes to the heart of the allegations against her in the petition, that is, that she failed to protect her children from exposure to an environment of domestic abuse.  Mother's lack of awareness, notwithstanding Mother's participation in programs and classes, posed an ongoing risk of harm for the children, which in our view, supports the court's finding under section 300, subdivision (b-1).  Accordingly, the court's exercise of jurisdiction under section 300, subdivision (b-1) was proper.

### B.  Disposition Order

On appeal, Mother argues that the evidence before the lower court was insufficient to support the juvenile court's dispositional orders removing the children from her custody and requiring her visitation to be monitored.[6]

After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing.  At the dispositional hearing, the court must decide where the child will live while under the court's supervision.  Before the juvenile court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or

---

[6]     Subsequent to the disposition proceedings, in June 2014, the court modified the visitation order to allow for Mother to have unmonitored visits with the children. Consequently, Mother's challenge to the order requiring monitored visits is moot.

guardian's physical custody. . . ." (§ 361, subd. (c)(1)[7]; see *In re Heather A.*, *supra,* 52 Cal.App.4th at p. 193.) At the dispositional phase of dependency proceedings the burden of proof is clear and convincing evidence. (See § 361; *In re Sheila S.* (2000) 84 Cal.App.4th 872, 881.)

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H., supra,* 82 Cal.App.4th at p. 1136 [disapproved on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6].) "In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*).) "The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.)

"Whether the conditions in the home present a risk of harm to the child is a factual issue." (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.) The court's dispositional finding is also subject to a sufficiency of the evidence standard of review. (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078.) That is, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.*, *supra*, 52 Cal.App.4th at p. 193.) Evidence of past conduct may be probative of

---

[7]     The guidelines and limitations for removal of a child from the custody of the parents are set forth in section 361. Section 361 provides, in pertinent part: "(c) A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5) . . . ." (§ 361, subd. (c)(1).)

13

current conditions, particularly where there is reason to believe the conduct will continue in the future.  (See *In re Rocco M., supra,* 1 Cal.App.4th at p. 824.)

Here, Mother claims that the dispositional order was infirm because the dependency court failed to consider less drastic measures than removal.  Mother maintains that the juvenile court did not adequately consider alternative, reasonable means by which the children could be protected without removing them from her home.  "Before the court removes a child from parental custody, it must find there are no reasonable means by which the child's physical health can be protected without removal.  [Citation.]  Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order.  [Citation.]"  (*Cole C., supra*, 174 Cal.App.4th at p. 918; § 361, subd. (d.).)

The record reflects, and the court found, the Department had made reasonable efforts to eliminate the need for removal of the minors from parental custody.  Even before the proceedings in the summer of 2013, the Department made efforts to assist Mother in retaining custody by developing a safety plan, but Mother failed to abide by the plan and even after obtaining a restraining order against him she returned to the family home with the children to live with Father.  As summarized above, between the time of detention and the time of the dispositional hearing, Mother participated in classes, programs and services and yet still failed to acknowledge the abuse that she had suffered; she denied the abuse and minimized Father's mental instability.  In addition, Mother did not have suitable housing; she lived with her parents in a home that was not appropriate for the children.

In sum, in our view, the court properly concluded that no reasonable means short of removal of the minors would be adequate to protect the minors' well-being, given the risk of harm.

**C.  ICWA**

Father contends the juvenile court failed to ensure compliance with the mandates of ICWA (25 U.S.C. § 1901 et seq.).  He argues the Department should be required to give notice to applicable Indian tribes regarding the dependency proceedings.

14

### 1. Background

At the outset of the proceedings the parents completed the ICWA-020 form. Mother disclosed she had no Native American ancestry, and Father indicated that his grandparents were Native American. When questioned at the detention hearing Father affirmed that: "I know for a fact that my grandmother is 'Blackfoot,' and my grandfather is Cherokee." The court ordered: "The [D]epartment is to investigate Indian ancestry on the father's side. The [D]epartment is to notice all . . . federally recognized Cherokee and the Blackfeet if the investigation indicates that is needed. Notice if triggered." Thereafter, when the Department interviewed Father about his heritage, the social worker reported that Father stated that: "he did not have an Indian registration card and did not know anyone in his family who had an Indian registration card. The father stated he was not aware of any relative who had documented Indian heritage."

At the continued jurisdiction/disposition hearing in December 2013 the court noted the results of the interview and inquired whether: "anyone think that's not a sufficient ICWA investigation? Any objection to the court finding that the ICWA investigation is complete?" Father did not object, and the court found the investigation was complete and that ICWA did not apply. ~(RT 65-66; CT Rule 8 p. 7.

### 2. Applicable Law

The purpose of ICWA is to "'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.'" (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174, quoting 25 U.S.C. § 1902; see also *In re Suzanna L.* (2002) 104 Cal.App.4th 223, 229; *In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1299.) "ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) For purposes of ICWA, an "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C., § 1903, subd. (4).)

15

ICWA provides, "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and its right to intervene. (25 U.S.C., § 1912, subd. (a); see *In re S.B.* (2005) 130 Cal.App.4th 1148, 1157.) This notice "enables the tribe to investigate and determine whether the minor is an Indian child" and "advises the tribe of the pending proceedings and its right to intervene or assume tribal jurisdiction." (*Desiree F., supra,* 83 Cal.App.4th at p. 470.) Failure to provide the necessary notice requires invalidation of actions taken in violation of ICWA. (*Id.* at p 472.)

California law contains its own notice requirements (§ 224.2, subd. (a)(5)) where the juvenile court or the Department knows or has reason to know that the dependency proceedings involve an Indian child. (§ 224.3, subd. (d).) The state also imposes a "continuing duty in dependency proceedings to inquire whether a child might be an Indian child." (*In re J.D., supra,* 189 Cal.App.4th at p. 123; Cal. Rules of Court, rule 5.481(a).) If the protections provided by state law are greater than the protections provided by ICWA, state law governs. (§ 224, subd. (d); accord, 25 U.S.C., § 1921; *In re H.B.* (2008) 161 Cal.App.4th 115, 120.)

Neither ICWA nor the governing federal regulations define the term "reason to know." (*In re S.B., supra,* 130 Cal.App.4th at p. 1158.) California law provides guidance in making this determination, however. Section 224.3, subdivision (b), provides: "The circumstances that may provide reason to know the child is an Indian child include, but are not limited to, the following:

> "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe.

16

"(2) The residence or domicile of the child, the child's parents, or Indian custodian is in a predominantly Indian community.

"(3) The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government, such as the Indian Health Service."

As soon as practicable, the social worker is required to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c); *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539; Cal. Rules of Court, rule 5.481(a)(4).)

### 3. Analysis

Respondent argues that the dependency court properly concluded that ICWA notice was not triggered in this case. Respondent maintains that the court had no reason to know that the children were Native American based on Father's statements to the social worker and his silence[8] at the hearing when the court asked whether there were any objections to the sufficiency and completeness of the investigation. We disagree.

Only a minimal showing is required to trigger the ICWA notice requirements. (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 254, 258.) If anyone related to the case suggests that a child has Indian ancestry, notice should be given. "Synonyms for the term suggest include 'imply,' 'hint,' 'intimate' and 'insinuate.' [Citation.]" (*Id.* at p. 254.) "The Indian status of the child need not be certain to invoke the notice

---

[8] Respondent properly recognizes that Father has not forfeited his complaint regarding ICWA. Indeed, the generally accepted rule in dependency cases is that the forfeiture doctrine does not bar consideration of ICWA notice issues on appeal. (See, e.g., *In re Marinna J.* (2001) 90 Cal.App.4th 731, 739.) "As this court has held, '[t]he notice requirements serve the interests of the Indian tribes "irrespective of the positions of the parents" and cannot be waived by the parent.' [Citation.] A parent in a dependency proceeding is permitted to raise ICWA issues not only in the juvenile court, but also on appeal even where, as here, no mention was made of the issue in the juvenile court." (*In re Justin S.* (2007) 150 Cal.App.4th 1426, 1435.)

requirement. [Citation.]" (*In re Desiree F., supra,* 83 Cal.App.4th at p. 471; *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1422; *In re Junious M.* (1983) 144 Cal.App.3d 785, 793.) "Enrollment is not required in order to be considered a member of a tribe; many tribes do not have written rolls. While enrollment can be one means of establishing membership, it is not the only means, nor is it determinative." (*In re Desiree F., supra,* 83 Cal.App.4th at pp. 470-471.) ICWA applies to children who are eligible for membership in an Indian tribe, even if not enrolled. (*Id.* at p. 471.) Section 224.3, subdivision (e )(1) also specifically provides that "[i]nformation that the child is not enrolled in the tribe is not determinative of status as an Indian child." A child may qualify as an Indian child within the meaning of the ICWA even if neither of the child's parents is enrolled in the tribe. (*Dwayne P., supra,* 103 Cal.App.4th at p. 258.)

Here, Father maintained that his grandparents had Indian American ancestry and he identified the tribes from which they were descended. Father has never disavowed his Native American ancestry. In our view, the fact that Father later stated that he did not have "registration cards" and did not have "documented" ancestry did not relieve the Department of its obligation to provide notice to the Bureau of Indian Affairs and to those tribes he had previously identified. Consistent with *Dwayne P.*, Father provided sufficient indication of Indian status to trigger notice under ICWA. The Department's failure to provide notice requires this matter be remanded to the juvenile dependency court for reconsideration after proper statutory notice is given.

To accomplish this limited remand, it is not necessary to reverse or vacate the juvenile court's disposition order. (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 385-386; accord, *Tina L. v. Superior Court* (2008) 163 Cal.App.4th 262, 268; *In re Veronica G.* (2007) 157 Cal.App.4th 179, 188.) After proper notice under ICWA, if it is determined that the children are Indian children and ICWA applies to these proceedings, Father is entitled to petition the juvenile court to invalidate orders that violated ICWA. (See 25 U.S.C., § 1914; *In re Veronica G., supra,* 157 Cal.App.4th at p. 188.)

18

### *DISPOSITION*

The jurisdiction findings under section 300, subdivision (b) and disposition orders of the juvenile court are affirmed.

The matter is remanded to the juvenile court for compliance with ICWA notification requirements and for further proceedings not inconsistent with this opinion. On remand, the court is also directed to modify the jurisdictional order by striking the allegations under section 300, subdivision (a) of the petition.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**

**SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.